BLOOMBERG L.P., Plaintiff

v.

UNITED STATES FOOD and DRUG ADMINISTRATION and United States Department of Health and Human Services, Defendants.

No. 06 Civ 6552(VM).

United States District Court, S.D. New York.

Aug. 15, 2007.

Thomas H. Golden, Willkie Farr & Gallagher LLP, New York City, for Plaintiff.

Lara K. Eshkenazi, U.S. Attorney's Office, New York City, for Defendants.

### DECISION AND ORDER

MARRERO, District Judge.

Defendants, the United States Food and Drug Administration ("FDA") and United States Department of Health and Human Services ("HHS") (collectively, "Defendants" or "the Government"), moved for a twenty-month stay of the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, et seq., proceeding initiated by Bloomberg, L.P. ("Bloomberg"), on November 3, 2006. On June 29, 2007, the Court issued an order denying Defendants' motion to stay. This decision and order sets forth the findings, reasoning, and conclusions referenced in the Court's previous ruling.

## I. BACKGROUND[1]

### A. THE PARTIES

Bloomberg provides real-time business, financial, and legal news to its subscribers worldwide by way of its global news service, international radio and television programming, and 24–hour news television stations. Bloomberg also publishes two monthly magazines and more than fifty books each year, in addition to distributing information by way of its website, which receives 3.5 million visits each month.

Defendant HHS is the principal government agency responsible for protecting the health of all Americans, as well as providing them with human services. Defendant FDA is an agency within HHS that evaluates, among other things, the safety and effectiveness of prescription and over-the-counter drugs. The Center for Drug Evaluation and Research ("CDER") is the division of the FDA that responds to FOIA requests regarding drugs; CDER's Division of Information Disclosure Policy ("DIDP"), in turn, processes those requests.

### B. FACTUAL ALLEGATIONS

In March or April of 2005, the FDA sent letters ("Initial FDA Inquiries") to several manufacturers of certain anti-epileptic drugs, including Topamax, Lyrica, and Neurontin, requesting information on the potential for those drugs to contribute to suicidal thoughts or actions. The FDA released copies of the Initial FDA Inquiries to the public and various media outlets reported on the content of those inquiries.

By letter dated February 2, 2006, Bloomberg submitted a FOIA request (the "FOIA Request") to the FDA seeking:

1. Any correspondence from Russell Katz of FDA to Pfizer dated on or about March 16, 2005 requesting data regarding suicidal thoughts or actions triggered by Neurontin;

2. Any correspondence dated from January 1, 2004 to present, from the FDA to manufacturers of other medications including Topamax, Lyrica, and other anti-epileptic drugs regarding suicidal thoughts or actions triggered by those chemicals; and

3. Letters and other material submitted to FDA by manufacturers of Neurontin, Topamax, Lyrica, and other anti-epileptic drugs in response to letters from Russell Katz and other requests by FDA for data on the development of suicidal thoughts and actions by patients taking Neurontin, Topamax, Lyrica, and other anti-epileptic drugs during clinical trials or during the post-marketing period.

The FDA received the FOIA Request on February 28, 2006. Pursuant to FOIA, the FDA was required to respond to this request by March 28, 2006. Bloomberg also requested expedited treatment for its FOIA Request, which the FDA was obligated to respond to by March 10, 2006. The FDA responded to Bloomberg on April 19, 2006, denying the request for expedited processing and leaving the substance of the request unaddressed.

By e-mail dated May 9, 2006, Bloomberg requested guidance on when the FDA would provide a substantive response to its FOIA Request. An employee of the FDA's FOIA staff indicated to Bloomberg

---

1. The factual recitation and contentions set forth below derive from the Complaint, dated August 29, 2006 and the Memorandum in Opposition to Defendants' Motion to Dismiss, dated November 17, 2006 ("Pl.'s Mem."). Except as quoted or otherwise specifically cited below, no further references to these documents will be made.

via telephone that it would take the FDA approximately one year to respond to the substance of the FOIA Request. On May 19, 2006, Bloomberg sent a letter to HHS, appealing both the FDA denial of expedited processing and the FDA decision to delay its substantive response to the FOIA request; HHS did not respond. On June 28, 2006, Bloomberg sent another letter, asking for a response to its FOIA Request and further indicated that it would file a suit to compel public disclosure if no response was received. The FDA did not respond. Bloomberg has exhausted its administrative remedies.

## II. *DISCUSSION*

### A. *STANDARD OF REVIEW*

When an agency does not respond to a FOIA request in accordance with the time period specified by statute, the requester may seek judicial review "to enjoin the agency from withholding agency records and to order the production of any agency records and to order the production of any agency records improperly withheld." 5 U.S.C. § 552(a)(4)(B). The Court reviews agency decisions, including those regarding expedited processing of FOIA requests, *de novo. See id.; see also Al–Fayed v. C.I.A.,* 254 F.3d 300, 304–06 (D.C.Cir.2001). FOIA requires expedited processing of requests if the relevant party demonstrates a compelling need for the materials. 5 U.S.C. § 552(a)(6)(E)(i). A "compelling need" encompasses "request[s] made by a person primarily engaged in disseminating information" that relate to an issue to which there is an "urgency to inform the public concerning actual or alleged Federal Government activity." 5 U.S.C. § 552(a)(6)(E)(v)(I-II).

However, if an agency can demonstrate that both exceptional circumstances exist and that it is exercising due diligence in responding to any type of FOIA process-ing request, "the court may retain jurisdiction and allow the agency additional time to complete its review of the records." 5 U.S.C. § 552(a)(6)(C)(i). Pursuant to that provision, courts have granted agencies a stay of litigation if (1) the agency is deluged with an volume of requests for information on a level unanticipated by Congress; (2) existing agency resources are inadequate to deal with the volume of requests within the time limits established § 552(a)(6)(C); and (3) and the agency can show that it is exercising due diligence in processing the requests. *See Open America v. Watergate Special Prosecution Force,* 547 F.2d 605, 616 (D.C.Cir.1976).

### B. *THE GOVERNMENT'S REQUEST FOR A STAY OF THE PROCEEDINGS*

#### 1. *Exceptional Circumstances*

According to the statutory language of FOIA, two factors drive the determination regarding the existence of "exceptional circumstances": unexpected volume and insufficient resources. *See Ross v. Reno,* No. 95–CV–1088, 1996 WL 612457, at *5 (E.D.N.Y. Aug. 13, 1996). The statute also makes clear that "the term 'exceptional circumstances' does not include a delay that results from a predictable agency workload" of requests. 5 U.S.C. § 552(a)(6)(C)(ii).

In the instant case, the Government's own description of the agency's response times and workload places its current number of FOIA requests squarely within anticipated levels. The FDA indicates that it processes a "constant stream of new FOIA requests," offers a steady monthly estimate of those requests, and, in fact, puts forth figures that indicate a downward trend. (*See* Gov.'s Mem. in Supp. Mot. Stay, dated Nov. 3, 2006 ("Gov.'s Mem.") at 7, 19.) DIDP, the division of

CDER that handles the FOIA requests received by the FDA regarding drugs, notes a decrease in requests from 5,310 in 2003 to 4,050 in 2005; only 2,400 requests had been made as of the first eight months of 2006. (*See id.* at 19.) Such evidence is reflective, not of an unpredicted spike in requests, but rather of a manageable workload flow encountered in the due course of FOIA processing. Thus, allowing a mere showing of a normal backlog of requests to constitute "exceptional circumstances" would render the concept and its underlying Congressional intent meaningless. *See, e.g., Reno,* 1996 WL 612457, at *5 ("Since it appears that the [agency] *always* has a huge backlog, the exception, would, in effect, become the norm.")(emphasis in original); *see also Fiduccia v. Dep't of Justice,* 185 F.3d 1035, 1041 (9th Cir.1999) (noting that "ordinary and expected" agency circumstances necessarily conflict with the FOIA requirement of "exceptional" circumstances).

■ The Court is mindful of DIDP's management of other responsibilities, including responses to subpoenas, postings to FDA's website, and document requests from Congress and other levels of government. However, the primary activity cited by DIDP as a source of some considerable increase—responding to Congressional document requests—is, according to the Government's submissions, situational and often timelimited.[2] While the examples provided are helpful to the Court in enabling it to gain an understanding of the effects of such Congressional inquiries, DIDP does not detail an existing request that has overwhelmed its resources and staff. In the absence of such information, coupled with what appears to be a manageable inflow of FOIA requests, the

Court is not persuaded that "exceptional circumstances" are sufficiently evident here.

## 2. *Due Diligence*

If an agency's delay is the result of an expected workload of requests, the agency must demonstrate "reasonable progress in reducing its backlog of pending requests." 5 U.S.C. § 552(a)(6)(C)(ii). The statutory contours of what defines "reasonable progress" have not been explicitly elaborated upon in this Circuit, but courts generally have considered a range of factors, including requests for additional funding, modernizing practices and equipment, and initiatives tied directly to backlog reduction. *See Elec. Frontier Found. v. Dep't of Justice,* No. 06–1708, 2007 WL 1334973, at *6 (D.D.C. May 7, 2007)(providing specific detail of backlog reduction efforts, including reductions in processing time); *Center for Pub. Integrity v. Dep't of State,* No. 05–2313, 2006 WL 1073066, at *3 (D.D.C. April 24, 2006)(describing backlog reduction initiatives, including a backlog reduction task force); *Edmonds v. F.B.I.,* No. 02–1294, 2002 WL 32539613, at *2 (D.D.C. Dec. 3, 2002) (noting partial identification of responsive documents as evidence of due diligence).

DIDP has listed staff, organizational, and funding changes and points to its decrease in backlog as indicative of the impact of these efforts. (*See* Declaration of Nancy B. Sager in Support of Motion to Stay, dated November 3, 2006 ("Sager Decl.") ¶¶ 29–35). The Court has given due consideration to the facts put forth by DIDP, but finds that the roughly equivalent decline in FOIA requests during the same period raises some questions about the Government's assertion of effectiveness. DIDP's backlog decreased from

---

2. For example, DIDP provides three examples of such Congressional inquiries, each of which lasted no longer than a year, with one example as brief as two months. (*See* Gov.'s Mem. at 8.)

6,783 to 4,264 from 2003 to 2006, a decline of approximately 37 percent. (*See id.* at. ¶ 34.) At the same time, DIDP's FOIA request level appears to have decreased by the same amount, approximately one-third or greater. (*See* Pl.'s Mem. at 14.) In light of this data, the fairly general submissions by the Government do not make explicit the link between broad agency changes and specific workload reduction efforts targeted at decreasing its FOIA request backlog and as such, are not sufficiently indicative of due diligence under the circumstances presented by this case.

While a general showing of an agency processing FOIA requests on a first-in, first-out basis, coupled with a multitrack processing system may be consistent with due diligence in some instances, this determination should not be automatic, and fails if extraordinary need is demonstrated. *See Leadership Conference on Civil Rights v. Gonzales,* 404 F.Supp.2d 246, 259 (D.D.C.2005) (denying stay because of absence of due diligence); *but see Rabin v. Dep't of State,* 980 F.Supp. 116, 122 (E.D.N.Y.1997)(citing *Open America,* 547 F.2d at 616). Moreover, the Court finds the FDA's refusal to provide Bloomberg with the easily produced Supplemental FDA Inquiries that clearly constitute "government activity" to suggest further evidence of either an uncooperative stance or a lack of due diligence in this case on the part of the agency. (*See* Gov.'s Mem. at 14–15.) The repeated missed deadlines, unexplained timeline adjustments, and limited communication from the Government further support this view. For example, the FDA:

- Responded to Bloomberg's February 28, 2006 request for expedited FOIA processing on April 19, 2006, over one month late;
- Did not respond to Bloomberg's May 19, 2006 appeal to the FDA's denial of expedited processing and the FDA's failure to provide a substantive response to Bloomberg's FOIA Request;
- Did not respond to Bloomberg's June 28, 2006 letter, asking the FDA to respond to the FOIA Request and indicating that it would file suit to compel public disclosure in the absence of a response;
- Had not responded to the FOIA Request as of Bloomberg's filing of the instant case on August 30, 2006, six months after the initial FOIA Request;
- Responded on September 1, 2006, only after the filing of the Complaint;
- Requested a twenty-month stay, resulting in an approximate deadline of June 2008—a date that is a year beyond its initial estimate of time required to complete the FOIA request, May 2007; and
- Offered no explanation regarding its refusal to disclose the Supplemental FDA Inquiries, a release of which would require none of the analysis or statistical processing that the Government asserts is necessary for the release of the information from the drug companies.

(*See* Compl. ¶¶ 23–34; Sager Decl., Exh. 6; Gov.'s Mem. at 1; Gov.'s Reply Mem. in Supp. Mot. Stay, dated Nov. 29, 2006 ("Gov.'s Reply Mem.") at 4–5.) Thus, the FDA's cumulative decisions suggest a pattern of unresponsiveness, delays, and indecision that suggest an absence of due diligence.

## C. BLOOMBERG'S REQUEST FOR EXPEDITED FOIA PROCESSING

### 1. Compelling Need

■ Pursuant to 5 U.S.C. § 552(a)(6)(E)(v), expedited processing of a FOIA request is warranted only upon a demonstration of "compelling need," which is defined as follows:

(I) that a failure to obtain requested records on an expedited basis . . . could

reasonably be expected to pose an imminent threat to the life or physical safety of an individual; or (II) with respect to a request made by a person primarily engaged in disseminating information, urgency to inform the public concerning actual or alleged Federal Government activity.

5 U.S.C. § 552(a)(6)(E)(v). Courts must consider at least the following three factors when determining whether an entity with a FOIA request had demonstrated a "compelling need": (1) "whether the request concerns a matter of exigency to the American public; (2) whether the consequences of delaying a response would compromise a significant recognized interest; and (3) whether the request concerns federal government activity." *Al–Fayed*, 254 F.3d at 310. The Government argues that no such compelling need or urgency exists in this instance essentially because, insofar as Bloomberg's request concerns government activity, such information from private drug companies and the Government's activity with regard to it has already been disclosed to the public.

 The Government's argument as expressed above raises a two-fold problem. First, the FDA narrowly defines what "concerns" government activity as a one-way street, meaning that it encompasses only information originating directly from the Government. (*See* Gov.'s Mem. at 15.) Even by this definition of what constitutes information that "concerns actual or alleged government activity," which the Court finds unduly rigid, the FDA has not yet released to the public all of the information pertinent to the FOIA Request at

issue. Thus, the Supplemental FDA Inquiries must be released by the Government to Bloomberg immediately.

Second, the statutory language mandating expedited treatment of FOIA requests is broader than the FDA suggests, in that such treatment is required where requests implicate an "urgency to inform the public concerning actual or alleged Federal Government activity." 5 U.S.C. § 552(a)(6)(E)(v). The use of the word "concerning" in this context is significant because it does not suggest an exclusive or definitive source of the information that might shed light on the relevant government activity. Instead, the word "concerning" in its ordinary meaning is much more broadly understood. Its definition is "relating to; to be about; to bear on." Merriam–Webster Online Dictionary, *http://www.merriam-webster.com* (last visited Aug. 13, 2007).[3] The Court finds it hard to imagine that information provided to the FDA in response to an FDA-initiated inquiry does not "relate to" federal government activity. Such a reading is not sweeping, as the Government contends, but rather hews to the three-pronged test in *Al–Fayed*, in that the "activity" which triggers this analysis was the FDA's decision to initiate the inquiry in the first instance. 254 F.2d at 310.

Having determined that the documents in question properly concern federal government activity, the Court must also explore whether the request concerns an urgent need of importance to the American public and whether its delay would compromise a significant recognized interest. *See id.* The FDA concedes the importance of public knowledge of the potential

---

**3.** The Court notes that the definition of "concerning" provided by Bloomberg from the Local Rules of this Court specifically applies to civil discovery requests, not to FOIA requests, but to the extent that this definition provides context regarding how "concerning"

is understood in another legal context, it is, at the very least, instructive. (*See* Local Civ. R. 26.3(7), defining "concerning" as "relating to, referring to, describing, evidencing, or constituting.")

association between certain anti-epileptic drugs and suicide-related adverse events, especially in children, and cites to at least one national news report of the Initial FDA Inquiry. (*See* Gov.'s Mem. at 13–15; Pl.'s Mem. at 4.) Knowledge of the Initial FDA inquiry, of which the FDA claims the public has already been made aware, is not equivalent to knowledge of further inquiries by the Government, responses to those inquiries, and the attendant analysis of those results. Hence, an exigent need still exists with respect to the subsequent data received by the FDA from the drug manufacturers and with respect to the findings of the FDA.

The analysis above also applies with respect to whether a significant recognized interest would be compromised by a delay in disclosure to the public. While the Government attempts to confine the recognized interest only to the FDA's analysis of the manufacturers' data, the Court considers that the broader recognized interest to be that of harm to the health of the public, particularly young adults, if sustained use of the identified anti-epileptic drug continues without more immediate guidance and information from the FDA.[4]

The urgency of the need for such information is not lessened by what the Government claims is the inability of the general public to understand the raw data submitted by the drug manufacturers. (*See* Gov.'s Reply. Br. at 3.) In fact, it is the compelling need for such public understanding that drives the urgency of the request. Delay of public awareness, well beyond the initial one-year estimate provided by the FDA in May 2006 of the information at issue here, is no longer tenable, especially in light of the absence of additional information from the Government as to the matter at issue here since its initial inquiry into drug manufacturers in March 2005.

### 2. *Current Posture of the Case*

On June 29, 2007, the Court denied the stay requested by the Government and ordered the parties to submit a proposed case management plan in light of that ruling. *See Bloomberg v. F.D.A.*, No. 06–6552, 2007 WL 1946539 (S.D.N.Y. June 29, 2007). In that the parties were unable to reach an agreed-upon plan for timing of FOIA response, the Court considered submissions from each party and, on July 26,

---

**4.** The Court notes the Government's argument that Bloomberg's interest is only in informing investors, and that physicians, as well as parents of children taking anti-epileptic medication, have been duly warned by the current labeling detailing the possible side effects of Neurontin and similar anti-epileptic drugs. Regardless of the private interests that may exist alongside those of the public, there is certainly a significant recognized public interest in the Government providing information in its possession, gathered or generated by its vast public resources, that may go well beyond the information that the private drug companies have chosen to place on the labels of their products.

Also, there is a significant recognized interest in knowing whether the Government-initiated investigation regarding the anti-epileptic drugs has yielded any important information that would inform the public debate and ad-

vance understanding of medical issues still unresolved. Indeed, taken at face value, much of the language from the Government, in papers responding to this proceeding, may be read to suggest that the FDA may offer no further information in this regard at all. (*See* Gov.'s Reply Mem. at 4, indicating that the FDA "will take appropriate steps to notify the public, if necessary."; *see also* Gov.'s Mem. at 15, noting that whether the FDA "will take the appropriate steps to notify the public . . . ." "depend[s] on the results of the investigation.") As Bloomberg puts forth, "Part and parcel of the public's right to know is understanding what the FDA knew about these potential side effects, when and how the FDA uncovered these potential side effects, and the forthrightness of pharmaceutical companies to the FDA about these potential side effects." (Sager Decl., Exh. 4.)

2007 (the "July 26th Order"), ordered a 75–day period within which the Government is to produce the requested disclosures. If good faith efforts by the Government to comply with the deadline are demonstrated, the FDA could, at the end of that period, seek an extension not to exceed fifteen days. The Court's previous orders should be read with the analysis from this decision as guidance.

### III. *ORDER*

For the reasons set forth above, it is hereby

**ORDERED** that the motion (Docket No. 7) of the United States Food and Drug Administration ("FDA") and United States Department of Health and Human Services ("HHS") to stay the Freedom of Information Act proceedings herein is DENIED.

**SO ORDERED.**